718

Jose Manuel ORTIZ; Pedro Vasquez; Luis Montoya; Juan Villanueva; Pascual Villalobos; Imelda Campos; Hector Lara; Reginaldo Dian; Ricardo Fernandez; Jose Yepez; Meliton Martinez; Rajinder Randhawa; Leonel Acosta; Guillermo Duarte, Plaintiffs–Appellees,

v.

Doris M. MEISSNER, INS Commissioner, Defendant–Appellant.

Miguel Olivares; Maria Gonzalez; Leticia Chavez; Roberto Ventura; Darshan Singh, Plaintiffs–Appellees,

v.

Doris M. Meissner, INS Commissioner, Defendant–Appellant.

Nos. 98–16471, 98–16472.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 9, 1999.

Decided June 3, 1999.

Thankful T. Vanderstar, United States Department of Justice, Washington, DC, for the defendant-appellant.

Jonathan M. Kaufman, Kaufman Law Office, San Francisco, California, for the plaintiffs-appellees.

Before: SCHROEDER, FERNANDEZ, and SILVERMAN, Circuit Judges.

SCHROEDER, Circuit Judge:

Plaintiffs are all aliens who have been administratively denied legalization under one of two amnesty programs established by Congress in 1986. The first program is for "special agricultural workers" ("SAWs"), 8 U.S.C. § 1160, and the second program is for aliens who have resided in the United States since January 1, 1982, 8 U.S.C. § 1255a. The programs contain parallel provisions that allow persons who file a non-frivolous or prima facie legalization application to receive authorization to work in this country pending a "final determination" on their legalization application. The plaintiffs maintain that the statute entitles unsuccessful applicants to retain their interim work authorization beyond the conclusion of administrative proceedings on their application and until the completion of judicial review of their deportation order. The district court agreed and issued an injunction requiring the government to issue work permits to the plaintiffs. The government appeals.

We must decide, first, whether the district court had jurisdiction to consider plaintiffs' claim, and if so, whether the district court correctly interpreted the statutory provisions. We hold that the plaintiffs' claim is within the jurisdiction of the district court, but that the government is correct that the statute provides for interim work authorization only until administrative proceedings on the application have ended.

The Statute and Procedural Background

Congress passed the Immigration Reform and Control Act of 1986 ("IRCA"), Pub.L. No. 99–603, 100 Stat. 3359, in response to the flood of illegal immigrants that had produced a "shadow population" of millions of undocumented aliens within this country. *See McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 481, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991). Congress simultaneously sought to aid existing aliens by creating two broad amnesty programs that would enable qualifying aliens to emerge from the shadows, while enacting other provisions to make the plight of non-qualifying undocumented aliens more difficult. *Id.* at 481–83, 111 S.Ct. 888. Both of the amnesty programs at issue are set out in parallel provisions of IRCA. Section 1160 comprises the SAW program and § 1255a the program for aliens who have continuously resided in this country since 1982.[1]

---

1. Sections 1160 and 1255a are materially identical for purposes of this appeal. Thus, we quote here only the relevant portions of § 1160. Section 1160 states in pertinent part:

§ 1160. Special agricultural workers
(a) Lawful residence
(1) In general
The Attorney General shall adjust the status of an alien to that of an alien lawfully

In order to procure the legalization benefits offered by the amnesty programs, the statute requires aliens to apply within a specified time period, ending November 30, 1988 for § 1160 SAW applicants, and May 4, 1988 for § 1255a applicants. *See* §§ 1160(a)(1)(A), 1255a(a)(1)(A). Aliens

> admitted for temporary residence if the Attorney General determines that the alien meets the following requirements:
> (A) Application period
> The alien must apply for such adjustment during the 18–month period beginning on the first day of the seventh month that begins after November 6, 1986.
> (B) Performance of Seasonal Agricultural Services and residence in the United States
> The alien must establish that he has—
> (i) resided in the United States, and
> (ii) performed seasonal agricultural services in the United States for at least 90 man-days, during the 12–month period ending on May 1, 1986. For purpose of the previous sentence, performance of seasonal agricultural services in the United States for more than one employer on any one day shall be counted as performance of services for only 1 man-day.
> (C) Admissible as immigrant
> The alien must establish that he is admissible to the United States as an immigrant, except as otherwise provided under subsection (c)(2) of this section.
>
> \* \* \* \*
>
> (d) Temporary stay of exclusion or deportation and work authorization for certain applicants
> (1) Before application period
> The Attorney General shall provide that in the case of an alien who is apprehended before the beginning of the application period described in subsection (a)(1) of this section and who can establish a nonfrivolous case of eligibility to have his status adjusted under subsection (a) of this section (but for the fact that he may not apply for such adjustment until the beginning of such period), until the alien has had the opportunity during the first 30 days of the application period to complete the filing of an application for adjustment, the alien—
> (A) may not be excluded or deported, and
> (B) shall be granted authorization to engage in employment in the United States and be provided an "employment authorized" endorsement or other appropriate work permit.
> (2) During application period
> The Attorney General shall provide that in the case of an alien who presents a

must also establish that they meet the requirements of the particular section. *See* §§ 1160(a)(1), 1255a(a). The statute entitles aliens to a single level of administrative appellate review of the agency determination on their application. *See* §§ 1160(e)(2)(A), 1255a(f)(3)(A). Aliens

> nonfrivolous application for adjustment of status under subsection (a) of this section during the application period, and until a final determination on the application has been made in accordance with this section, the alien—
> (A) may not be excluded or deported, and
> (B) shall be granted authorization to engage in employment in the United States and be provided an "employment authorized" endorsement or other appropriate work permit.
>
> \* \* \* \*
>
> (e) Administrative and judicial review
> (1) Administrative and judicial review
> There shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection.
> (2) Administrative review
> (A) Single level of administrative appellate review
> The Attorney General shall establish an appellate authority to provide for a single level of administrative appellate review of such a determination.
> (B) Standard for review
> Such administrative appellate review shall be based solely upon the administrative record established at the time of the determination on the application and upon such additional or newly discovered evidence as may not have been available at the time of the determination.
> (3) Judicial review
> (A) Limitation to review of exclusion or deportation
> There shall be judicial review of such a denial only in the judicial review of an order of exclusion or deportation under section 1105a of this title (as in effect before October 1, 1996).
> (B) Standard for judicial review
> Such judicial review shall be based solely upon the administrative record established at the time of the review by the appellate authority and the findings of fact and determinations contained in such record shall be conclusive unless the applicant can establish abuse of discretion or that the findings are directly contrary to clear and convincing facts contained in the record considered as a whole.

may obtain judicial review of the determination only upon a final order of deportation or exclusion. *See* §§ 1160(e)(3)(A), 1255a(e)(2)(A). In its review of the administrative denial of the application, the court may only look to the administrative record established at the time of the administrative review proceeding. *See* §§ 1160(e)(3)(B), 1255a(e)(2)(B).

We have consolidated for this decision two appeals from cases filed in the district court in 1996. Treating them as related cases, the district court granted summary judgment in favor of the plaintiffs. The parties agree that the only issues before us are issues of law that we review de novo. *See Naranjo–Aguilera v. INS,* 30 F.3d 1106, 1109 (9th Cir.1994); *Farr v. U.S. West Communications, Inc.,* 151 F.3d 908, 913 (9th Cir.1998).

### District Court Jurisdiction

The government contends that the district court lacked jurisdiction of these cases because the statute vests exclusive jurisdiction for review in the court of appeals following the final order of deportation. The critical statutory provision states in relevant part:

> There shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection.... The Attorney General shall establish an appellate authority to provide for a single level of administrative appellate review of such a determination.
>
> ... There shall be judicial review of such a denial only in the judicial review of an order of exclusion or deportation....

§ 1160(e); *see also,* § 1255a(f)(1) (review upon order of deportation only).

The Supreme Court has decided two cases interpreting this provision. *See McNary,* 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991); *Reno v. Catholic Social Servs.,* 509 U.S. 43, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993) ("*CSS*"). Two guiding principles have emerged from those decisions and those of the lower courts that have interpreted the statute. *See, e.g., Naranjo–Aguilera,* 30 F.3d at 1112–13; *Ayuda, Inc. v. Reno,* 7 F.3d 246, 249 (D.C.Cir.1994).

■ The first principle is that district court jurisdiction under 28 U.S.C. § 1331 remains for challenges to certain Immigration and Naturalization Service ("INS") procedures or practices in handling applications. *See McNary,* 498 U.S. at 493, 111 S.Ct. 888; *Naranjo–Aguilera,* 30 F.3d at 1112–13 (recognizing that district court jurisdiction exists for "collateral, procedural challenges to INS practices in the processing of applications" (internal quotations omitted)). This jurisdiction exists because the limited review scheme of § 1160(e)(1) would not produce an adequate administrative record to allow for meaningful judicial review of these collateral claims. *See McNary,* 498 U.S. at 493, 111 S.Ct. 888.

In *McNary,* for example, the plaintiffs alleged that the INS conducted the SAW interview process in an arbitrary fashion. *Id.* at 487, 111 S.Ct. 888. They claimed that the INS denied applicants the opportunity to present witnesses on their own behalf, that the INS did not provide competent interpreters, and that the lack of any verbatim recording of the interview inhibited meaningful administrative review of denials. *Id.* The Court held that the district court had jurisdiction over these claims. It reasoned that § 1160(e), limiting judicial review over "determinations respecting an application," referred to review of denials in individual cases, not attacks on collateral procedures used in all cases. *Id.* at 492, 111 S.Ct. 888. The Court pointed out that if the district court did not have jurisdiction over such collateral claims, meaningful judicial review of them would be thwarted due to the inadequate record and the inability of courts of appeals to find facts and develop a record. *Id.* at 496–97, 111 S.Ct. 888. Our circuit

law is consistent. *See Campos v. Nail,* 43 F.3d 1285, 1290 (9th Cir.1994) (district court had jurisdiction over asylum seekers' claim challenging a particular Immigration Judge's practice of refusing to grant change of venue motions, notwithstanding similar jurisdictional limitations in the relevant section).

■ The second principle is that aliens may challenge INS interpretation or application of IRCA's substantive eligibility criteria only on review of an order of deportation. *See Naranjo–Aguilera,* 30 F.3d at 1113; *see also CSS,* 509 U.S. at 60, 113 S.Ct. 2485 (aliens whose applications had been denied due to an unduly restrictive INS interpretation of the continuous residency requirement, § 1255a(a)(3)(A) & (B), could obtain review only in the courts of appeals upon a final order of deportation). In *Naranjo–Aguilera,* this court held that the district court lacked jurisdiction over a challenge to the substantive interpretation of an IRCA provision that concerned the eligibility for SAW status of aliens who had been convicted of one felony or three misdemeanors. 30 F.3d at 1109, 1113. The District of Columbia Circuit has similarly held that a challenge to the INS's interpretation of another § 1255a requirement, relating to the government's knowledge of a previously legal immigrant's illegal status, 8 U.S.C. § 1255a(a)(2)(B), was maintainable only in the review of a deportation order. *See Ayuda,* 7 F.3d at 249; *c.f. Massieu v. Reno,* 91 F.3d 416, 423–24 (3d Cir.1996) (alien must challenge the constitutionality of the statute under which deportation was brought in the context of court of appeals review of his deportation order).

In sum, applicants may not sue in district court to establish their eligibility for these programs, but must instead confine themselves to the administrative and judicial review provided in the sections. At the same time, if the administrative record is insufficient to provide a basis for meaningful judicial review of a procedure or policy that is collateral to an alien's substantive eligibility for these programs, then resort to the district court to ensure fair procedures is warranted.

■ This case involves the interim status to be accorded applicants whose eligibility for legalization has been administratively denied. The plaintiffs do not challenge the INS's interpretation of the substantive eligibility requirements for legalization, nor do they challenge the application of these requirements in any particular case. The government asserts that the issues here integrally relate to an alien's eligibility for legalization, yet the requirements for work authorization and legalization are different. The statute requires only that an alien file a nonfrivolous or prima facie application to attain a work authorization. To attain legalization, an alien must fulfill all of the substantive requirements of the relevant section. Presumably the INS made a determination that each of these plaintiffs filed either a nonfrivolous or prima facie application. The subsequent denial of the application does not affect this initial conclusion.

More important, unless the district court has jurisdiction, there will be no meaningful opportunity for these plaintiffs to obtain a resolution of this claim. Plaintiffs, according to the government, must wait until they have been ordered deported to seek interim work authorization in a court of appeals review of the deportation proceeding. Yet by that time, the period in which plaintiffs claim they are entitled to work authorization would already have passed. The legal issue would be moot. District court jurisdiction is therefore available because limiting judicial review of the INS's construction of the statute here would be "the practical equivalent of a total denial of judicial review" of this claim. *McNary,* 498 U.S. at 497, 111 S.Ct. 888; *see also Thunder Basin Coal Co. v. Reich,* 510 U.S. 200, 212–13, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994) (claims considered collateral when otherwise, all meaningful judicial review would be foreclosed); *Cam-*

*pos,* 43 F.3d at 1291 (finding district court jurisdiction over pattern and practice claim because "appropriate relief would not be available under the statutory scheme for appeals"). Thus, the district court properly exercised jurisdiction over these plaintiffs' actions.

### The Merits of the Appeal

■ The government appeals the district court's holding that aliens were entitled to work authorization through completion of judicial review of their legalization application, which can only occur after a final order of deportation. The pertinent language of the statute reads:

> The Attorney General shall provide that in the case of an alien who presents a nonfrivolous application for adjustment of status under subsection (a) of this section during the application period, *and until a final determination on the application has been made in accordance with this section,* the alien—(A) may not be excluded or deported, and (B) shall be granted authorization to engage in employment in the United States....

§ 1160(d)(2) (emphasis added). Section 1255a(e)(2) contains materially identical language.

The INS contends that the phrase "final determination" signifies the final administrative determination, and that if there is any ambiguity, the agency's interpretation is entitled to deference under *Chevron v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The district court rejected the INS's interpretation of the phrase "a final determination has been made in accordance with this section" because both §§ 1160 and 1255a contain subsections providing for judicial review. *See* §§ 1160(e)(3), 1255a(f)(4). The district court, citing *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), also found the INS did not merit *Chevron* deference because it had changed its interpretation of the statute during the course of the litigation.[2]

■ On appeal the government renews its claim that *Chevron* deference is appropriate. We need not defer, however, if we can ascertain congressional intent using the traditional tools of statutory construction. *See Cardoza–Fonseca,* 480 U.S. at 446, 107 S.Ct. 1207. Using traditional tools, we conclude that Congress intended that the automatic stay of deportation and the work authorization last only until the final administrative determination on the application.

We look first to the statutory language. Congress consistently used the word "determination" in the two sections before us to refer to agency, not court, decisions. *See, e.g.,* §§ 1160(b)(4), 1255a(c)(3) (qualified designated entities may not make determinations that Attorney General charged with making under the section); § 1160(b)(6)(A)(i), 1255a(c)(5)(A)(i) (Department of Justice may only use information furnished by applicant to make a determination under the section); §§ 1160(c)(2), 1160(c)(2)(C), 1255a(d)(2), 1255a(d)(2)(B)(iii) (grounds for exclusion taken into account by INS when making determination on admissibility); §§ 1160(e)(1), 1160(e)(2)(A), 1160(e)(2)(B), 1160(e)(3)(B), 1255a(f)(1), 1255a(f)(3)(A), 1255a(f)(3)(B), 1255a(f)(4)(B) (administrative and judicial review of agency's determinations respecting an application). In

---

**2.** The government had initially argued that applicants' work authorization expired at the time of their first administrative denial. When plaintiffs informed the court that this litigation position conflicted with the INS's actual practice, which was to extend work permits until the completion of administrative review, the INS conceded its error and conformed its litigating position to its practice. That practice is in accord with INS regulations, which allow for work authorization during the administrative review period. *See, e.g.,* 8 C.F.R. §§ 245a.2(n)(4), 245a.3(i), 274a.12(c)(22). The record reflects that the INS position has been consistent and that its counsel had mistakenly described it.

fact, the only time the word is used outside the agency context is in § 1255a(d)(2)(C), which requires applicants "to undergo ... a medical examination (including a determination of immunization status)." Neither section refers to any judicial "determination."

The description of the review as "final" lends little support to plaintiffs' interpretation. The last stage of administrative review is frequently described as "final" so as to trigger the time for seeking judicial review. *See, e.g.,* 8 U.S.C. § 1252(b) (judicial review of final order); 8 U.S.C. § 1324a(e)(7)-(8) ("decision and order of an administrative law judge shall become the final agency decision" and alien may petition the court of appeals within forty-five days to review the final order); 8 U.S.C. § 1324b(i)(1) (court of appeals will review final order); 5 U.S.C. § 704 (provision in APA for judicial review of final agency action).

The district court's holding that the plaintiffs were entitled to work authorization until the completion of judicial review of their administrative legalization denial rested on the language providing for work authorization until "a final determination ... has been made in accordance with this section." Because "this section" contains provisions for administrative and judicial review, the district court found it arbitrary to distinguish between the two for work authorization purposes. Once we understand the phrase "final determination" to mean final agency decision, then the phrase "made in accordance with this section" must refer to INS's processing and adjudicating the application in accordance with the criteria of the relevant section.

We look not only to the language but also to the aims of the statutory amnesty programs. *See Cardoza–Fonseca,* 480 U.S. at 449, 107 S.Ct. 1207. Extending work authorization through judicial review of deportation orders would not be consistent with the overall congressional objectives in enacting this legislation. Congress intended to make the plight of undocumented workers more onerous while at the same time allowing existing undocumented aliens, who can qualify for legalization, to emerge from the shadows. *See McNary,* 498 U.S. at 481–83, 111 S.Ct. 888. With both of these goals in mind, it is unlikely that Congress intended applicants under these amnesty programs to be permitted to work legally during the institution and pendency of deportation proceedings and through the subsequent judicial review of the deportation order. Indeed Congress must have intended to separate administrative proceedings on a legalization application from deportation proceedings, for it prohibited the INS from using information garnered from the alien in the amnesty process to institute deportation proceedings. *See* §§ 1160(b)(6), 1255a(c)(5).

The Supreme Court's *McNary* and *CSS* decisions also support our conclusion that automatic work authorization and stay of deportation are for the duration of the final administrative proceedings on the legalization application, not through the uncertain duration of deportation proceedings, which might never be instituted. In *McNary,* the Court characterized the work authorization received by an applicant as one that "would remain valid during the entire period that the application was being processed." 498 U.S. at 484, 111 S.Ct. 888. The Court indicated the application process was separate from deportation proceedings. It described the limited allowance for judicial review of the "final administrative determination" on the application, pointing out that review would only occur if "deportation proceedings against an unsuccessful applicant" were initiated. *Id.* at 485–86, 111 S.Ct. 888. The Court also identified Congress' purpose in creating the SAW program as improving only the lot of those who qualify for amnesty, not of those who do not qualify and must face lack of work and possible deportation. *Id.* at 490–91, 111 S.Ct. 888. The Court explained that

[SAW] status not only protects the alien from deportation; it also creates job

opportunities that are not available to an alien whose application is denied. Indeed, the denial of SAW status places the alien in an even worse position than he or she was in before [IRCA] was passed because lawful employment opportunities are no longer available to such persons. Thus, the successful applicant for SAW status acquires a measure of freedom to work and to live openly without fear of deportation or arrest that is markedly different from that of the unsuccessful applicant.

*Id.*

In *CSS*, the Court similarly explained the diminished status of aliens whose applications have been rejected by the INS, in comparison to the status of aliens whose applications are still pending:

[A]n alien whose appeal has been rejected by the Associate Commissioner stands (except for a latent right to judicial review of that rejection) in the same position he did before he applied: he is residing in the United States in an unlawful status, but the Government has not found out about him yet.

509 U.S. at 54, 113 S.Ct. 2485.

Plaintiffs' interpretation would put the alien whose administrative appeal has been rejected in a better position than the alien enjoyed before he applied. That result is not consistent with congressional intent embodied in the language of the statute and as understood by the Supreme Court. We conclude that §§ 1160(d)(2) and 1255a(e)(2) provide for work authorization through the completion of administrative proceedings on an alien's legalization application, but not through judicial review of subsequent deportation proceedings.

The judgment of the district court is REVERSED and the case REMANDED FOR ENTRY OF SUMMARY JUDGMENT in favor of the United States. The permanent injunction issued by the district court is VACATED.