Ali **PADASH**, Petitioner,

v.

**IMMIGRATION AND NATURALIZATION SERVICE,** Respondent.

No. 02–70439.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 16, 2003.

Filed Feb. 19, 2004.

Frank P. Sprouls, Law Office of Ricci & Sprouls, San Francisco, CA, for the petitioner.

Nancy Friedman, Office of Immigration Litigation Civil Division, Department of Justice, Washington, DC, for the respondent.

Before: REINHARDT, SILER,* and HAWKINS, Circuit Judges.

REINHARDT, Circuit Judge:

Ali Padash ("Padash") petitions for review of an order of the Board of Immigration Appeals ("BIA") denying his application for asylum and withholding of deportation. Padash contends that the BIA erred in concluding that he had not established past persecution or a well-founded fear of persecution in India or Iran. He also challenges the BIA's determination that he is ineligible to adjust his status to that of permanent resident as a derivative beneficiary of his parents' visa.

We affirm the BIA's decision to deny his application for asylum and withholding of deportation, but reverse the denial of adjustment of status. The latter denial was based on a determination that Padash was not statutorily eligible for permanent residence because, having turned twenty-one before his visa was adjudicated, he no longer fit within the Immigration and Nationality Act's ("INA") definition of a child. INA § 101(b)(1), 8 U.S.C. § 1101(b)(1). Because we hold that the subsequently-enacted Child Status Protection Act of 2002,[1] which prevents individuals from "aging out" of a visa category as a result of delays in visa processing and adjudication, applies to Padash, we reverse and remand to the BIA for further proceedings.

## I

On or about August 1, 1992, Padash, a native of India and a citizen of Iran,[2] came to the United States to visit his aunt and uncle in California. Padash and his mother left their home in India suddenly, without saying goodbye to Padash's father, who had been missing for a week prior to their departure. At the time, Padash was seventeen. One month after their arrival in the United States, Padash's mother also disappeared inexplicably, leaving Padash in the care of relatives. Padash testified that he has neither seen nor heard from his mother since then.

On April 19, 1995, the INS served Padash with an order to show cause, charging him with the deportable offense of over-staying his temporary visa in violation of INA § 237(b), 8 U.S.C. § 1227(b). Padash conceded deportability but requested asylum and withholding of deportation from both India and Iran.

In support of his application for asylum, Padash testified that he fears persecution in India on the basis of his Muslim religion. His claim is based on two incidents of violence that occurred at his father's restaurant. During the first incident, five individuals came into the restaurant and

---

* The Honorable Eugene E. Siler, Circuit Judge, United States Court of Appeals for the Sixth Circuit, sitting by designation.

1. Pub.L. No. 107–208, 116 Stat. 927 (2002).

2. Padash was born in India and resided with his parents in Poona, Maharashtra. He has never visited or lived in Iran. He obtained an Iranian passport because his grandparents were born there.

asked for an item on the menu. When Padash told the customers that the item was unavailable, they started a fight. They threw stones at the restaurant and insulted Padash, calling him various names, including religious slurs. There was a police station across the street. Neither Padash nor his father called for help, but the officers could hear the commotion. Shortly after the fight began, they came to the restaurant, stopped the altercation, and arrested the individuals involved. One month later, a different group of individuals started a similar fight. Although Padash was not present on that occasion, his father told him that one of the men threatened to kill the two of them. Padash left India a few weeks after the second altercation. Padash testified that because the current regime in India is "against the Muslims," he fears for his safety if he is returned.

On the assumption that the IJ might order him deported to Iran if the Indian government denied him reentry, Padash requested asylum and withholding of deportation from that country as well.[3] Padash testified that he was afraid that if he were returned to Iran, he would be forced to join the military and that he might be killed as a result. He testified that two of his cousins died while serving in the Iranian military in 1992.

The IJ found Padash credible but denied his application for asylum and withholding of deportation, holding that he had not established past persecution or a well-founded fear of persecution if returned to India, or alternatively, Iran. Padash appealed to the BIA.

On September 5, 1984, a fourth preference family-based visa petition had been filed with the INS by Padash's uncle, who is a United States citizen. *See* INA § 203(a)(4), 8 U.S.C. § 1153(a)(4). Padash was included as a derivative beneficiary on this petition. *See* INA § 203(d), 8 U.S.C. § 1153(d). The INS approved the petition on October 24, 1984 and transferred it to the American Embassy in Bombay, India to await issuance of a permanent resident visa.

On March 1, 1996, while Padash's appeal was pending before the BIA, the permanent resident visa finally became available. Padash filed a motion with the BIA to expedite and reopen the deportation proceedings, arguing that he was entitled to an adjustment of his status. At the time, because Padash was under twenty-one years of age, he was eligible for immediate issuance of a visa as a child "accompanying" his parents, the principal alien beneficiaries of the 1984 petition. *Id.*[4]

On April 3, 1996, the BIA granted Padash's motion, concluding that he was prima facie eligible to adjust his status, and remanded the case to the IJ for consideration. The IJ did not hold a hearing on the matter until June 24, 1997, more than a year after the case was remanded. According to Padash's counsel, sometime prior to the hearing, the consulate office in India granted Padash's parents permanent residence status based on their approved visa petitions. At the hearing, the IJ concluded, however, that Padash was no longer eligible for adjustment because he had turned twenty-one on May 21, 1996, and therefore no longer met the definition of

---

3. Padash told the IJ that it was his understanding that he cannot return to India because he has lost his residency as a result of being out of the country for more than a year. Padash, however, never contacted the Indian consulate to determine whether he would in fact be barred from returning.

4. As such, Padash was entitled to the same status and the same order of consideration as his parents. *Id.* That Padash physically entered the country prior to his parents is immaterial to his ability to obtain a visa under the statute.

"child" under section 101(b) of the INA (defining "child" as an unmarried person under twenty-one years of age).

On February 26, 2002, the BIA affirmed the IJ's decisions in all respects. The BIA concluded that Padash had not established past persecution or a well-founded fear of future persecution on a ground protected under the INA. The BIA stated that the events in which Padash was involved, the two fights at his family's restaurant and the accompanying religious slurs and threats, did not rise to the level of harm required to establish past persecution. It also concluded that Padash had failed to show that the government of India was unable or unwilling to control the restaurant patrons who harassed and threatened his family. Indeed, the BIA noted that the police broke-up the first fight in the restaurant and arrested the offending individuals. The BIA then determined, *inter alia*, that Padash had failed to establish a pattern or practice of government persecution of Muslims on account of religion. The BIA also affirmed the IJ's finding that Padash failed to present sufficient evidence that the Iranian military sought to recruit or harm him "on account of" a protected ground under the INA. Finally, the BIA held that Padash was not eligible to adjust his status as a derivative beneficiary because he had turned twenty-one and no longer met the definition of "child" under section 101(b).

## II

### A. Asylum and Withholding of Deportation

Padash contends that the BIA erred in denying his petition for asylum and withholding of deportation. We review the BIA's factual determinations, including findings that an asylum applicant has failed to demonstrate statutory eligibility, for substantial evidence. *INS v. Elias-Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812,

117 L.Ed.2d 38 (1992). The BIA's determination must be upheld if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (quoting 8 U.S.C. § 1105a(a)(4)). Reversal is warranted only if the evidence presented was such that a reasonable fact-finder would be compelled to conclude that the petitioner was persecuted or has a well-founded fear of persecution on account of "race, religion, nationality, membership in a particular social group, or political opinion." *Id.;* INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A) (defining "refugee").

■ To establish eligibility based on past persecution, an asylum applicant must show "(1) an incident, or incidents, that rise to the level of persecution; (2) that is 'on account of' one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either 'unable or unwilling' to control." *Navas v. INS*, 217 F.3d 646, 655–56 (9th Cir.2000) (footnotes omitted). Once past persecution has been established, "a presumption arises that a well-founded fear of future persecution exists." *Id.* at 657 (citing 8 C.F.R. § 208.13(b)(1)).

■ After reviewing the record, we conclude that the BIA's determination that Padash failed to establish past persecution on account of his religion is supported by substantial evidence. Persecution has been defined as "the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive." *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir.1995) (quotation omitted). "Discrimination, harassment, and violence by groups that the government is unwilling or unable to control can[ ] constitute persecution." *Singh v. INS*, 94 F.3d 1353, 1359 (9th Cir.1996). "The key question is whether, looking at the cumulative effect of all the incidents a

petitioner has suffered, the treatment [he] received rises to the level of persecution." *Korablina v. INS*, 158 F.3d 1038, 1044 (9th Cir.1998).

Padash's testimony that two separate and unrelated groups of restaurant patrons initiated fights with his family—fights that did not result in any physical harm—and that during the second incident a threat was made against him and his father, falls short of the showing necessary to compel a finding of persecution.[5] Padash has presented no evidence to suggest that these episodes were part of a pattern of discrimination against him or his family based on his religion, *see Duarte de Guinac v. INS*, 179 F.3d 1156, 1162 (9th Cir. 1999) (evidence of widespread discrimination against individuals who possess a particular "offensive" characteristic strengthens the petitioner's claim of persecution), or that the state was unwilling to or did not have the ability to control the individuals involved. *Cf. Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir.1997) (holding that petitioner who suffered threats of violence and whose father suffered physical violence at the hands of a terrorist group that the government could not control had established past persecution). To the contrary, the police broke-up the first fight and arrested the offending patrons without the Padash family even calling for help. Thus, at most, Padash's testimony establishes that he suffered discrimination by isolated individuals, some of whom were arrested by the authorities. This does not amount to past persecution under the INA.

The evidence in the record also falls short of establishing that Padash had a well-founded fear of future persecution if he is returned to India. To establish eligibility based on a well-founded fear of persecution, the alien must demonstrate that his fear of persecution was subjectively genuine and objectively reasonable. *Arriaga–Barrientos v. USINS*, 937 F.2d 411, 413 (9th Cir.1991). Padash offered no evidence that either the individuals involved in the two restaurant fights or the Indian government sought to harm him upon his return. The only support for Padash's claim was his generalized statement that the government in India is "against Muslims." This statement without more is insufficient to establish that he is at "particular risk" of persecution if deported. *See Khourassany v. INS*, 208 F.3d 1096, 1101 (9th Cir.2000)(holding petitioner's contention that the Israeli government used "brutal and torturous" tactics against Palestinians to be too generalized to show that the petitioner was at particular risk of future persecution). Further, the record is devoid of evidence of pervasive discrimination against Muslims by the Indian government. To the contrary, the 1995 State Department Country Report makes it clear that "the Government of India does not systematically discriminate against . . . Muslims on grounds of race and religion." In fact, the report notes that "[a]pproximately 100 million Muslims lead productive lives in India. They live, work, and worship without interference by the Government." On the record presented, we uphold the BIA's determination.

We also affirm the BIA's conclusion that Padash failed to establish that the Iranian military sought to recruit or harm him "on account of" a protected ground under the INA. Padash has not established that he would either be forced

---

5. Padash did not testify that his departure from India or his father's disappearance shortly before that departure was related to the events at the restaurant or to other violence, threats, or harassment on account of religion. To the contrary, he repeatedly told the IJ that he did not know why he and his mother had left or why his father was missing.

into military service or singled out for persecution by military officials during such service on account of his religion or any other statutorily-protected ground. *Compare Duarte de Guinac,* 179 F.3d at 1160 (holding that the evidence compelled a finding of past persecution because during forced military service, officials singled out the petitioner, threatened his life, and repeatedly beat him because of his race). To the contrary, from the record it appears that all Iranian men are required to serve and that any harm that might befall Padash would be on account of the ordinary dangers associated with military duty.

■ Because the evidence does not compel a finding of past persecution or a well-founded fear of future persecution, it follows that Padash has not established eligibility for withholding of deportation if deported to either country. *Singh v. INS,* 134 F.3d 962, 971 (9th Cir.1998) (stating that the standard for withholding of deportation is "more stringent" than the showing required for asylum; the petitioner must demonstrate that it is "more likely than not" that persecution will occur if the alien is deported). Accordingly, we affirm the denial of his application for asylum and withholding of deportation.

## B. Adjustment of Status

■ Padash contends that the BIA erred in finding him statutorily ineligible for adjustment of status on the ground that he was no longer a "child" at the time of the hearing before the IJ. He asserts that the Child Status Protection Act of 2002 ("Act"), which amended the INA to provide age-out protection for individuals who were children at the time a petition or application for permanent resident status was filed on their behalf, applies in his case. Under the former version of the statute, Padash was not eligible to adjust his status at the time of the hearing before the IJ because he had turned twenty-one and his application had not yet been acted upon. Under the newly amended version of the statute, however, an individual eligible for permanent residence as a derivative beneficiary under INA § 203(d), 8 U.S.C. § 1153(d), who is over twenty-one years of age may have his status adjusted provided that: (1) he was a "child" on the date upon which the immigrant visa became available for his parents, (2) he applied for adjustment of status within one year of availability, and (3) he "aged out" while waiting for his application to be adjudicated. INA § 203(h)(1)(A)-(B), 8 U.S.C. § 1153(h)(1)(A)-(B). Padash satisfies all three of these criteria. Therefore, if the Child Status Protection Act applies to him, the BIA's decision to deny his petition on the basis of his age must be vacated and the case remanded for further proceedings.

The part of the Act that determines whether it applies to Padash is sub-section 8 of section 201 of the INA. That sub-section provides:

The amendments made by this Act shall take effect on the date of the enactment of this Act [August 6, 2002] and shall apply to any alien who is a derivative beneficiary or any other beneficiary of—

(1) a petition for classification under section 204 of the Immigration and Nationality Act (8 U.S.C. 1154) approved before such date but only if a *final determination has not been made on the beneficiary's application* for an immigrant visa or adjustment of status to lawful permanent residence pursuant to such approved petition;

(2) a petition for classification under section 204 of the Immigration and Nationality Act (8 U.S.C. 1154) pending on or after such date; or

(3) an application pending before the Department of Justice or the Department of State on or after such date.

INA § 201(8), 8 U.S.C. § 1151 note (emphasis added). Padash's petition for review of his asylum, withholding of deportation, and adjustment of status claims was pending before this court on August 6, 2002. Accordingly, he contends, the provisions of the Act apply to him because under part (1) of sub-section 8, the court's failure to act prior to that date means that no "final determination" of his statutory eligibility for adjustment of status had been made prior to the Act's effective date. The government maintains that the Act is inapplicable because the agency involved (the BIA, which is a subdivision of the Department of Justice) did make a "final determination" on his petition prior to the effective date. Thus, we are presented with a question of statutory interpretation, namely whether "final determination" means final determination of the matter or final determination by the agency involved. If it is the former, Padash is eligible to seek an adjustment of status because he falls under the protection of the Act.

### i. *Standards of Review*

■ "We interpret a federal statute by ascertaining the intent of Congress and by giving effect to its legislative will." *Hernandez v. Ashcroft*, 345 F.3d 824, 838 (9th Cir.2003) (quotation omitted). We review questions of law regarding the INA de novo. *Melkonian v. Ashcroft*, 320 F.3d 1061, 1065 (9th Cir.2003); *Kamalthas v. INS*, 251 F.3d 1279, 1281 (9th Cir.2001) (same). "Deference to the [agency's] interpretation of the immigration laws is only appropriate if Congress' intent is unclear." *Socop–Gonzalez v. INS*, 272 F.3d 1176, 1187 (9th Cir.2001) (en banc) (citing *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Because, as in *Ortiz v. Meissner*, 179 F.3d 718 (9th Cir.1999), we can ascertain congressional intent by employing "traditional tools of statutory construction," deference is not required. *Id.* at 723 (citing *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)) (using traditional tools of statutory construction to determine the meaning of "final determination" and holding that deference is not required under these circumstances); *INS v. St. Cyr*, 533 U.S. 289, 320 n. 45, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) ("We only defer . . . to agency interpretations of statutes that, applying the normal tools of statutory construction, are ambiguous."). Using these traditional tools, we conclude that Congress's intent is clear and that it meant the Act to apply to petitioners whose cases were awaiting a final determination by this court at the time of the statute's enactment.[6]

6. Even if we were to accord some level of deference here, we would apply *Skidmore* rather than *Chevron* deference. Under that standard, we would then conclude that the agency's interpretation should not be followed. *See United States v. Mead*, 533 U.S. 218, 228, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) ("The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.") (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)); *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) ("[I]nterpretations contained in formats such as opinion letters are 'entitled to respect' . . . but only to the extent that those interpretations have the 'power to persuade.' ") (quoting *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). Counsel for the INS did not present *any* arguments or supporting authority that would suggest that the agency itself had thoroughly considered the issue and taken a "reasoned and consistent" view of the Act or that his position was anything more than a "convenient litigating position." *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212–13, 109 S.Ct. 468,

### ii. *Statutory Construction*

#### a. *Plain and Ordinary Meaning*

Because our analysis is governed by fundamental principles of statutory construction, we begin by looking to the plain meaning of the term at issue. We recognize that the term "final determination" is susceptible to two different meanings, depending on the intent of the user and the context in which it is used.[7] The first, more customary, and more general, meaning is a final decision from which no appeal can be taken. Under that meaning, the term "final" retains its ordinary connotation—"last" or "ultimate." The other, less common, narrower, meaning is a decision

of a particular body or official that meets the finality requirements for purposes of an appeal or petition for review from that body or official to the next.[8] When Congress intends the latter meaning, it ordinarily specifies the particular body or official to whose determination it is referring. *See, e.g.,* 7 U.S.C. § 6997(d) ("[T]he notice provided by the hearing officer shall be considered to be a notice of an administratively final determination."); 5 U.S.C. § 3312(b) (directing the "Office [of Personnel Management to] make a final determination on the physical ability of the preference eligible to perform the duties of the position ...."); 5 U.S.C. § 8503(b) ("A final determination by the Secretary with

---

102 L.Ed.2d 493 (1988) (holding that no deference is due to an agency's litigating position). In our independent research, however, we discovered an internal agency memorandum, which defines "final determination" for purposes of adjustment of status as "agency approval or denial issued by the Service or Executive Office for Immigration Review." It also defines the term "pending" as "agency action ..., including an appeal or motion to reopen filed with the Administrative Appeals Office (AAO) of the Board of Immigration Appeals, if such appeal or motion was filed and/or pending on August 6, 2002." *Memorandum for Regional Directors,* Immigration Services Division, Office of International Affairs (February 14, 2003). The agency's interpretation contained in its memorandum is entirely unpersuasive, however. First, the INS's construction is not supported by any analysis or reasoning and therefore lacks any indicia of the type of considered decisionmaking that we find worthy of deference. *Navarro–Aispura v. INS,* 53 F.3d 233, 235–36 (9th Cir.1995) (declining to defer to agency's decision where it was not supported by a rational explanation). Second, as we explain more fully in the text, the agency's construction is contrary to the policy and purposes of the Act and to the intent of Congress. *Beltran–Tirado v. INS,* 213 F.3d 1179, 1185 (9th Cir.2000) (the court is not obligated to accept an interpretation that it is contrary to the plain and sensible meaning of the statute).

**7.** On appeal, the government argues only that the term "final determination" means "final

order of deportation." The term "final order of deportation" is a term of art in the immigration context referring to the BIA's decision to order an immigrant deported (or the IJ's decision to do the same, if the immigrant does not timely appeal). *See* INA § 101(a)(47)(A)-(B), 8 U.S.C. § 1101(a)(47)(A)-(B) (defining "order of deportation" and explaining how such an order becomes "final"). Where Congress intends to use this expressly defined term in the INA, it does so explicitly. *See, e.g.,* INA § 309(c)(4), 8 U.S.C. § 1101 note (discussing judicial review of a "final order of ... deportation"). It is a "well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words," and we must assume that the difference in usage is legally significant. *SEC v. McCarthy,* 322 F.3d 650, 656 (9th Cir.2003). Accordingly, we will not import the definition of "final order of deportation" here, where Congress intentionally employed a different term.

**8.** *Black's Law Dictionary* gives two basic definitions for the term final determination which parallel the definitions we offer: (1) "a decision from which no appeal or writ of error can be taken," and (2) a decision "which settles rights of parties respecting the subject-matter of the suit and which concludes them until it is reversed or set aside." *Black's Law Dictionary* 629 (6th ed.1990).

respect to entitlement to compensation under this section is subject to review. . . ."); 5 U.S.C.App. 1 Reorg. Plan V 1940 ("final determination shall be made by the Attorney General"); 7 U.S.C. § 6c(d)(1) ("[T]hat person may continue to grant or issue options pending a final determination by the Commission on the application."); 8 U.S.C. § 1503(c) ("A final determination by the Attorney General that any such person is not entitled to admission . . . shall be subject to review. . . ."). In instances in which Congress has not specified a particular official or agency whose decision will be final, the more usual meaning of the term—i.e., the "last" or "ultimate" determination from which no further appeal may be taken—generally applies.[9]

Here, it is the Court of Appeals' decision (assuming the parties do not petition for certiorari), not the BIA's decision, which ultimately settles the dispute between the parties (unless, of course, the court reverses or remands and the agency subsequently issues a further determination that is not itself appealed). Because a petitioner can appeal from both a denial of adjustment of status based on statutory eligibility grounds, *see Hernandez,* 345 F.3d at 845 (court retains jurisdiction over the nondiscretionary determination of statutory eligibility for adjustment of status), as well as a final order of deportation after the denial of a visa, *see* IIRIRA § 309(c)(4); 8 U.S.C. § 1252(a) (court retains jurisdiction over final orders of exclu-

sion and deportation), the BIA's decision to deport an alien as a result of his purported failure to meet the statutory definition for visa or adjustment eligibility is *not* a decision from which no appeal or petition for review can be taken.

We conclude that, here, Congress intended to use the term "final determination" in its ordinary, more general, sense—to refer to a "decision from which no appeal or writ of error can be taken," *Black's Law Dictionary* 696 (6th ed.1990). In other words, the term refers not to the final decision by the agency but to the final determination of the matter. Our conclusion is based not only on Congress's use of the term without any limiting reference to a particular official or body, but on "the statute's language, structure, subject matter, context, and history—factors that typically help courts determine a statute's objective and thereby illuminate its text." *Almendarez–Torres v. United States,* 523 U.S. 224, 228, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998).

b. Statutory Provision In Context

■ We must analyze the statutory provision in question in the context of the governing statute as a whole, presuming congressional intent to create a coherent regulatory scheme. *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 132–33, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). In this regard, we must "mak[e] every effort not to interpret [the] provision [at issue] in a manner that renders other pro-

**9.** We have regularly used the term "final determination" without a modifier, such as "agency," "BIA," or "Secretary," to mean the close of judicial proceedings. *See, e.g., Catholic Social Services, Inc. v. INS,* 232 F.3d 1139, 1151 (9th Cir.2000) (stating that the petitioners "would suffer immediate and severe hardship if its members were deported or denied work authorization pending *final determination* of their suits" in court); *Chadha v. INS,* 634 F.2d 408, 431 n. 32 (9th Cir.1980) (stating that "a *final determination* of the correct-

ness of an application of statutory criteria to an individual case is an essential judicial function"), *affirmed by INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); *Sciama v. Del Guercio,* 255 F.2d 50, 52 (9th Cir.1958) (stating that a petitioner asked the court to "review the administrative file, declare the deportation order void, and restrain government officials from proceeding with deportation until *final determination* of the matter").

visions of the same statute inconsistent, meaningless or superfluous." *Boise Cascade Corp. v. EPA,* 942 F.2d 1427, 1432 (9th Cir.1991); *United States v. Powell,* 6 F.3d 611, 614 (9th Cir.1993) (same). If we were to construe the term "final determination" in 8 U.S.C. § 1151(8)(1) ("provision (1)") to mean only a final agency determination, as the government suggests, we would violate this basic rule of construction, because such a reading would render provision (3) of subsection 8 (§ 1151(8)(3)) redundant. Provision (3) deals expressly with all applications pending before the two principal agencies charged with administering the visa program,[10] the Department of Justice, of which the BIA is a part, and the Department of State; it provides that the Act applies where an application is "pending" before the "Department of Justice or the Department of State" on (or after) the date of its enactment. Thus, provision (3) already provides that the Act applies to an application upon which a final determination by the appropriate agency has not been made prior to the Act's date of enactment, and adopting the government's construction of provision (1) would render that provision entirely duplicative of provision (3). We cannot assume that Congress intended two separate provisions in the same sub-section to have the same meaning. It must have intended to do more in provision (1). When provision (1) is read to include applications pending before the courts, as is the result when we give "final determination" its more customary meaning, then, and only then, does provision (1) add any substantive obligation to those already imposed by provision (3); in short, only given

such a reading, does provision (1) have any substantive effect.

A review of the prior drafts of the bill, together with the ultimate modifications adopted by Congress when it finally enacted the provision at issue here, demonstrates the validity of this reasoning. The evolution of sub-section 8 reveals that the legislature added provision (1) with the intent of broadening the Act's applicability beyond individuals whose applications were awaiting agency determinations, so as to include those individuals whose appeals were pending in the courts. We note first that the original version of the bill that passed unanimously out of the House Judiciary Committee contained a sweeping retroactivity provision, stating that the Act would apply to all petitions filed or determinations made "before, on or after the date of the enactment." H.R. 1209, 107th Congress, 1st Session, Reported in the House (April 20, 2001), WL 2001 CONG U.S. HR 1209. This provision would not only have extended coverage to all persons who had applications pending before the agencies or the courts at the time of the adoption of the Act, but also to all persons whose cases had been determined adversely to them by any entity at any time in the past on the ground that they had aged-out before their applications or petitions had received final approval. While supporting the aims of the legislation generally, the Department of Justice expressed concern that this all-inclusive retroactivity provision would create an excessive administrative burden on the agency, which removes applications for adjustment from its tracking system after the pertinent litigation is completed.[11] In its attempt to respond to

---

**10.** After the Act's passage, a third agency, the Department of Homeland Security, took over many of the functions of the INS, which had been housed in the Department of Justice.

**11.** The Department expressed fear that it might have to reconsider decisions made as long ago as 1952. However, it also recog-

nized that Congress "may seek to address cases of children who have aged out in the past" and stated that "if Congress considers it necessary to address past cases, we would prefer a reasonable limit to retroactivity, such as making the changes retroactively applicable only to petitions denied as a result of the

these concerns, the House went further than necessary to accommodate the Department's concerns; it specifically limited the bill's application to individuals with applications or petitions pending before the agency involved on or after the date of enactment.[12] The amended House bill clearly excluded petitions pending on review before the courts and if enacted, would have prevented Padash from obtaining the relief he seeks. However, when the House bill reached the Senate, that body divided the House's applicability section into two parts: provision (2), which addresses pending petitions for classification under section 204 of the INA, and provision (3), which addresses applications pending before the Department of Justice or the Department of State. H.R. 1209, 107th Congress, 2d Session, Engrossed Amendment Senate (June 13, 2002), WL 2001 CONGRESS U.S. HR 1209. More important, however, the Senate *added* another overriding provision—provision (1) which applied to all those whose applications (for adjustment of status or otherwise) had not been finally determined at the date of enactment. *Id.* With the addition of provision (1), Congress effectively expanded the class of petitioners to whom relief would be provided beyond the class of petitioners already covered by the House bill—those whose applications were pending before the agencies involved—so as to include individuals awaiting final judicial determination of the matter. In doing so, it limited the scope of the Act to those applications that were still active in

the decisional process and it met the Department of Justice's concern that the retroactivity provision not sweep up long terminated cases in which the files might be unavailable. In sum, only if provision (1) is understood to expand coverage beyond that afforded by the amended House bill, can the Act be read so as to give substantive content to that provision, as we must do in performing our task of statutory construction.

### c. Legislative Purpose and Intent

Our conclusion that "final determination" means final determination of the matter is consistent with, and supported by, congressional intent as revealed by an examination of the purpose underlying the statutory scheme. *United States v. Buckland*, 289 F.3d 558, 565 (9th Cir.2002) (en banc) (stating that the Court should look to legislative purpose behind the statute's passage where Congress's intent can not be ascertained from a plain reading). The legislative objective reflects Congress's intent that the Act be construed so as to provide expansive relief to children of United States citizens and permanent residents. Congress's goal in enacting the Child Status Protection Act was to address the "enormous backlog of adjustment of status (to permanent residence) applications" which had developed at the INS. H.R.Rep. No. 107–45, *2, *reprinted in* 2002 U.S.C.C.A.N. at 641. The House Judiciary Committee, in recommending passage of the bill, noted that, at the time, the back-

---

beneficiary aging out within a specified period of time." H.R. Rep. 107–45, *6–7 (2001), *reprinted in* 2002 U.S.C.C.A.N. 640, 644, 2001 WL 406244. The bill that Congress ultimately adopted does not apply to as many cases as the Department suggested would be permissible under a cut-off based on a number of years past, but is limited to cases that were still within the Department's tracking system, cases that the agency was still in the process of litigating in the courts.

12. The revised applicability section provided: "The amendment ... shall apply to all petitions and applications pending before the Department of Justice and the Department of State on or after[the date of enactment]." H.R. 1209, 107th Congress, 1st Session, Referred in Senate (June 7, 2001), WL 2001 CONG U.S. HR 1209.

log of unprocessed vias applications was close to one million. *Id.* Because of delays of up to three years, approximately one thousand of the applications reviewed each year by the agency were for individuals who had aged-out of the relevant visa category since the time they had filed their petitions. *Id.* Congress stated that the purpose of the Child Status Protection Act was to "address[ ] the predicament of these aliens, who through no fault of their own, lose the opportunity to obtain [a] ... visa." *Id.; see also* 80 No. 7 Interrel 233 (February 19, 2003) ("The [Act's] impact may be far-reaching, as it fundamentally reforms the process for determining whether a child has "aged out" of eligibility for visa issuance or adjustment of status in most immigrant visa categories."). The Department of Justice's only objection to the enactment of the statute was that the agency would be faced with an unmanageable administrative burden if Congress did not impose a reasonable limit on the statute's retroactive effect. As we have explained, that objection was accommodated in the final version of the bill by limiting the Act's applicability to individuals whose applications had not been finally resolved as of the time of passage of the Act. Including not only those individuals whose applications were pending before the State and Justice Department, but also the relatively small number of individuals whose petitions were then pending in court, surely best effectuated Congress's intent.

Because the legislative history makes it clear that the Act was intended to address the often harsh and arbitrary effects of the age-out provisions under the previously existing statute, our interpretation of the term "final determination" also adheres to the general canon of construction that a

rule intended to extend benefits should be "interpreted and applied in an ameliorative fashion." *Hernandez,* 345 F.3d at 840. This rule of construction applies with additional force in the immigration context "where doubts are to be resolved in favor of the alien." *Id.* (quotations and citations omitted); *Alvarez–Santos v. INS,* 332 F.3d 1245, 1250 (9th Cir.2003) (same); *St. Cyr,* 533 U.S. at 320, 121 S.Ct. 2271 (quoting *Cardoza–Fonseca,* 480 U.S. at 449, 107 S.Ct. 1207 (emphasizing that there is a "long-standing principle construing any lingering ambiguities in deportation statutes in favor of the alien")); *Matter of Vizcaino,* 19 I. & N. Dec. 644, 648, 1988 WL 235455 (BIA 1988) (noting that the expansion of relief "clearly was intended as a generous provision, and it should therefore be generously interpreted").

We have interpreted the term "final determination" in only one other case. In *Ortiz v. Meissner,* as here, we recognized that the term was subject to two plausible constructions: [13] final determination of the matter or final agency determination. 179 F.3d at 723. In *Ortiz,* we concluded that, with respect to the provision at issue there, Congress intended to employ the second meaning. *Id.* at 725. *Ortiz* dealt with the issue whether Congress intended to extend work authorization for agricultural workers seeking to adjust their work status only until the adverse conclusion of their administrative reviews under the amnesty program or to extend it until the completion of a court review of separately initiated deportation proceedings. *See* 8 U.S.C. §§ 1160(d)(2) and 1255(a)(e)(2). Because Congress passed the statute to achieve conflicting goals, controlling "the flood of illegal immigrants that had produced a 'shadow population' of millions of

---

**13.** Even though in *Ortiz* the agency's construction was consistent with our reading of the term, we did not defer to the agency's interpretation of "final determination" because using normal tools of statutory construction, we could properly ascertain the congressional intent. 179 F.3d at 723.

undocumented aliens," *Ortiz*, 179 F.3d at 719, while at the same time "allowing existing undocumented aliens, who can qualify for legalization, to emerge from the shadows," *id.* at 724, we held that it would not be consistent with Congress's intent to permit all of the applicants who were administratively denied relief under the amnesty program "to work legally during . . . and through the subsequent judicial review of the deportation order." *Id.* We stated that such an interpretation would create absurd results, namely granting immigrants denied amnesty in administrative proceedings the right to work "legally" for lengthy periods following issuance of final orders of deportation whereas other aliens not here legally were prohibited from working even in the absence of any adverse determination. This result, we noted, would have been clearly contrary to one of the twin goals of the statute because it would have placed undocumented aliens who were denied administrative relief in a better position than they were in prior to the denial of their legalization petitions. *Id.* at 725.

Here, there are no conflicting objectives, such as we found in *Ortiz*, and no absurd consequences that result from our adopting the more common meaning of the term "final determination." To the contrary, here Congress had but one goal in passing the Child Status Protection Act, an affirmative one—to override the arbitrariness of statutory age-out provisions that resulted in young immigrants losing opportunities, to which they were entitled, because of administrative delays. Accordingly, adopting a restrictive reading of the statute in order to limit relief, would contravene Congress's intent, and the purpose and objective of the law.

In sum, Congress passed the Act to provide broad protection to young immigrants who were required to wait years for their approved visas to become available, only to have agency delays in processing their applications or petitions prevent them from obtaining permanent residence status. In order to alleviate the Department of Justice's concerns regarding its inability to reopen and properly adjudicate cases which had long ago been litigated to finality and thereafter removed from its tracking system, Congress did not make the Act retroactive to all immigrants previously denied relief. Instead it provided relief only to those individuals whose cases had not yet been finally resolved, and thus only to those whose records were readily available to the agency. Giving the term "final determination" its ordinary meaning would place within that group young immigrants—whose petitions for review were pending in court as well as those whose requests were pending before the pertinent agency. No statutory purpose or objective would be furthered by giving the narrower or less usual of the two fixed meanings to the term "final determination," and thus depriving immigrants of their eligibility for adjustment of status simply because their cases were pending before a court instead of an administrative agency. To so restrict the statute's applicability would contravene Congress's objectives. For these reasons, we hold that the Child Status Protection Act applies to Padash.

We AFFIRM the BIA's decision to deny asylum and withholding of deportation, REVERSE the BIA's determination that Padash was not statutorily eligible because he had turned twenty-one prior to his petition being acted upon by the IJ, and REMAND to the BIA for further proceedings consistent with this opinion.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.